UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

JOHN ROBERT BENSON,                )
                                   )
        Petitioner,                )
                                   )
v.                                 )            4:03-cv-71
                                   )            *Mattice*
                                   )
KEVIN MYERS, Warden,               )
                                   )
        Respondent.                )

## **MEMORANDUM**

This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed by petitioner John Robert Benson ("Benson"). The matter is before the court on the respondent's answer to the petition and Benson's response. For the following reasons, the petition for the writ of habeas corpus will be **DENIED** and this action **DISMISSED WITH PREJUDICE**.

I.      Standard of Review

A state prisoner is entitled to habeas corpus relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. Under Rule 8 of the Rules Governing Section 2254 Cases In The United States

District Courts, the court is to determine, after a review of the answer and the records of the case, whether an evidentiary hearing is required. If no hearing is required, the district judge is to dispose of the case as justice dictates. If the record shows conclusively that Benson is not entitled to relief under § 2254, there is no need for an evidentiary hearing and the petition should be denied. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

II.     Factual Background

The respondent has provided the court with copies of the relevant documents as to Benson's direct appeal and post-conviction proceedings. [Court File No. 6, Notice of Filing Documents, Addenda 1-4]. Benson was convicted by a jury, in the Circuit Court of Bedford County, Tennessee, of two counts of attempted first degree murder and three counts of reckless endangerment. He was sentenced as a Range I offender to concurrent sentences of 22 years each on the attempted murder convictions, and as a Range II offender to four years each on the reckless endangerment convictions. Two of the three reckless endangerment offenses were ordered to be served concurrently, with the reckless endangerment convictions ordered to be served consecutive to the attempted murder convictions, for a total effective sentence of 30 year in the Tennessee Department of Correction. The judgments of conviction were affirmed on direct appeal. *State v. Benson*, No. 01C01-9806-CC-00239, 2000 WL

2

19535 (Tenn. Crim. App. January 13, 2000) [Addendum 2, Document 3], *perm. app. denied, id.* (Tenn. October 16, 2000 [Addendum 2, Document 5].

Benson then filed a petition for post-conviction relief. The post-conviction petition was denied after an evidentiary hearing, and the Tennessee Court of Criminal Appeals affirmed. *Benson v. State*, No. M2001-02510-CCA-R3-PC, 2002 WL 31777741 (Tenn. Crim. App. December 12, 2002) [Addendum 4, Document 3, *perm. app. denied, id.* (Tenn. April 28, 2003) [Addendum 4, Document 5].

In support of his petition for the writ of habeas corpus, Benson alleges the following: (1) the evidence was insufficient to support the conviction; (2) the sentence he received was excessive; and (3) he received ineffective assistance of counsel. The respondent contends he is entitled to judgment as a matter of law based on procedural default with respect to the third claim, for lack of federal jurisdiction on the second claim, and on the findings of the Tennessee state courts as to the first claim.

III.    Discussion

*A. Procedural Default / Ineffective Assistance of Counsel*

The doctrine of procedural default is an extension of the exhaustion doctrine. A state prisoner's petition for a writ of habeas corpus cannot be granted by a federal court unless the

3

petitioner has exhausted his available state court remedies. 28 U.S.C. § 2254. This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971). *See also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (Exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review."). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

Benson cannot file another state petition for post-conviction relief. Tenn. Code Ann. § 40-30-102(a). Accordingly, he has no remedy available to him in the Tennessee state courts for challenging his conviction and is deemed to have exhausted his state remedies.

It is well established that a criminal defendant who fails to comply with state procedural rules which require the timely presentation of constitutional claims waives the right to federal habeas corpus review of those claims "absent a showing of cause for the non-compliance and some showing of actual prejudice resulting from the alleged constitutional violation." *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977). *Accord Engle v. Isaac*, 456 U.S. 107, 129 (1982) ("We reaffirm, therefore, that any prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief.").

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).

Benson alleges that his attorney failed to properly investigate his case, failed to properly prepare for a suppression hearing, and failed to challenge the actions of the police when Benson was first arrested. Benson raised numerous allegations of ineffective assistance of counsel in his petition for post-conviction relief. [Addendum 3, p. 20, Grounds for Relief in support of Post-Conviction Petition; pp. 37-40, Amended Petition for Post-Conviction Relief]. On appeal from the denial of that petition, however, Benson only raised one issue of ineffective assistance of counsel: "Trial counsel was ineffective in not moving for a mistrial and thus obtaining additional time to properly prepare for a suppression hearing on the issue of the 'misidentification.'" [Addendum 4, Document 1, Brief of Appellant, p. 9].

The allegations of ineffective assistance of counsel which Benson raises in the pending habeas petition were never presented to the Tennessee Court of Criminal Appeals and thus Benson has defaulted those claims. Benson argues his procedural default should be waived because it was the fault of his appointed post-conviction attorney. Attorney error

5

will constitute cause to excuse procedural default only if it rises to the level of constitutionally ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Coleman v. Thompson*, 501 U.S. 722, 755 (1991); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). *See also McCleskey v. Zant*, 499 U.S. 467, 494 (1991).

Ineffective assistance of counsel, however, cannot violate the constitution where there is no Sixth Amendment right to counsel, *Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982), and a post-conviction petitioner has no constitutional right to counsel. *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("[T]he right to appointed counsel extends to the first appeal of right, and no further."); *Murray v. Carrier*, 477 U.S. at 488. Accordingly, Benson's allegations of attorney error cannot suffice as "cause" to excuse his procedural default. *See Coleman v. Thompson*, 501 U.S. at 752. *See also Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 426 (6th Cir. 2003) ("To the extent Gulertekin may assert ineffective assistance of her post-conviction counsel as cause for the procedural default of her claim for ineffective assistance of trial counsel, she is barred by the fact that she has no constitutional right to such counsel."); *cf.* 28 U.S.C. § 2254(I) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

*B. Excessive Sentence / Lack of Jurisdiction*

Benson alleges his sentence is excessive under the facts of his case. He specifically refers to the trial court's application of a sentencing enhancement under Tennessee law. Such an allegation fails to state a claim for federal habeas corpus relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); *Lewis v. Jeffers*, 497 U.S. 764, 779 (1990) ("federal habeas corpus relief does not lie for errors of state law"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."); *Sinistaj v. Burt*, 66 F.3d 804, 807 (6th Cir. 1995) ("Errors of state law alone cannot form the basis of relief under federal habeas corpus."); *Houston v. Dutton*, 50 F.3d 381, 385 (6th Cir. 1995) ("When and how state law applies to a particular case is a matter on which the state supreme court has the last word. No federal issues are implicated and no federal question is presented in determining whether a change in state law is to be applied retroactively.") (citation omitted).

To the extent Benson may claim his sentence is in violation of the United States Constitution, he has procedurally defaulted such a claim. Benson challenged his sentence on direct appeal only as an error under state sentencing law. [Addendum 2, Document 1, Brief of Defendant/Appellant, pp. 11-12]. If a petitioner raises a constitutional claim for the first time in the federal habeas corpus petition and if the petitioner is precluded procedurally from now raising the claim in state court, the claim is waived unless the petitioner shows

cause and actual prejudice. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Riggins v. McMackin*, 935 F.2d 790, 793 (6th Cir. 1991)

> A federal court will not address a habeas petitioner's federal constitutional claim unless the petitioner has first fairly presented the claim to the state courts. *Hannah v. Conley*, 49 F.3d 1193, 1196 (6th Cir. 1995). Fair presentation of a federal constitutional issue to a state court requires that the issue be raised by direct citation to federal cases employing constitutional analysis or to state cases relying on constitutional analysis in cases with similar fact patterns. *Id*.

*Deitz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004). Benson has not demonstrated cause for his failure to raise the issue of his sentence as a constitutional issue.

### C. State Court Findings / Sufficiency of the Evidence

Pursuant to 28 U.S.C. § 2254(d), Benson may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court. In addition, findings of fact by a state court are presumed correct and Benson must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e). Benson has failed to rebut, by clear and convincing evidence, the findings of the state courts and they will be presumed correct by this court.

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly

8

established Supreme Court law under § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id*. at 413. A state court decision "involves an unreasonable application of clearly established Federal law" only where "the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

Benson alleges that the evidence was not sufficient to support his convictions. He claims that most witnesses identified a person with different physical features than his and that the only person who identified him as the shooter had been drinking.

In a federal habeas corpus proceeding in which a state prisoner challenges the sufficiency of the evidence supporting his conviction, the petitioner "is entitled to a determination whether the record evidence could support a finding of guilt beyond a reasonable doubt." *Moore v. Duckworth*, 443 U.S. 713, 714 (1979). However, the petitioner is entitled to habeas relief only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt." *Jackson v.*

9

*Virginia*, 443 U.S. 307, 324 (1979). *See Brofford v. Marshall*, 751 F.2d 845, 856 (6th Cir. 1985).

When reviewing a jury's verdict under a sufficiency of the evidence standard, a court must consider all the evidence in a light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. at 319. Witness credibility is an issue to be left solely within the province of the jury, *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992); *United States v. Schultz*, 855 F.2d 1217, 1221 (6th Cir. 1988), and substantial deference should be given to the trier of fact. *United States v. Ayotte*, 741 F.2d 865, 867 (6th Cir. 1984). "[T]he federal court sitting in habeas should not attempt to substitute its own opinion for that of the jury which convicted the petitioner." *York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988). A conviction should be affirmed if *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir. 1986), *aff'd*, 483 U.S. 171 (1987).

The Tennessee Court of Criminal Appeals summarized the evidence against Benson as follows:

> The appellant's convictions resulted from a shooting at the Forest Hills apartment of Jenine McBride in Shelbyville, Tennessee in the early morning hours of August 17, 1997. Andrew Rankins testified on behalf of the State that on Saturday, August 16, 1997, James McBride, Trishia Pease, Ashley Benson, and he spent the evening together. Late that evening, the group returned to Jenine McBride's apartment, where they planned to spend the night. When they arrived at the apartment, Jenine McBride was asleep on the living room sofa. James McBride fell asleep on the living room floor with Ashley Benson, Pease's twenty month old daughter, while Rankins and Pease retired to the bedroom.

Rankins recalled that, sometime before sunrise, he awoke to use the restroom and as he was returning to the bedroom, he heard the sound of gunshots coming from the front of the apartment. He heard three to four shots, a kicking sound, and then two more shots. Rankins proceeded to the living room and saw several people running out the front door. When Rankins yelled, "What's going on?" he observed a man armed with a rifle turn and move back toward the front door. Rankins immediately ran to the door and kicked the door shut in an effort to keep the intruder out of the apartment. However, because the door had been kicked off the hinges, the door failed to close. When the door swung back open, Rankins saw the intruder in the doorway.

According to Rankins' testimony, Rankins then grabbed the barrel of the rifle and a struggle ensued inside the apartment. As the two men wrestled over control of the rifle, the intruder fired one shot. Eventually, both men fell to the floor, and Rankins pinned the intruder to the floor. Rankins told the intruder that he could leave if he left the gun behind. The intruder continued to struggle and sometime during the struggle the stocking covering the intruder's face rolled up, exposing the intruder's eyes and face. Rankins testified that he "could see the intruder's face clearly" for about two minutes despite the darkness of the room. Recognizing the intruder as Ashley Benson's father, Rankins told the intruder, "You could have killed your baby." For a moment the intruder stopped struggling and shook his head.

As Rankins was talking with the intruder, Pease entered the living room, and picked up Ashley Benson. The intruder then managed to fire another bullet that lodged in the wall. The two men began wrestling again and fell onto the floor. Rankins managed to lock his legs around the barrel of the rifle and again told the intruder that he was not leaving with the gun. The intruder then bit Rankins on the shoulder and also cut Rankins' hand as the intruder was attempting to eject a cartridge from the rifle. Realizing that the rifle was jammed, the intruder suddenly released the rifle and ran out of the apartment. Rankins did not attempt to follow the intruder.

The police arrived shortly after the intruder fled the scene. Rankins surrendered the rifle used in the shooting, and the police interviewed witnesses at the apartment. Some of the witnesses indicated that there may have been two suspects, but could not provide a description of any second suspect. At some point during the questioning, Rankins indicated that he believed the man with whom he had wrestled was the appellant. Trishia Pease then provided a

description of the appellant's automobile, a blue Chevrolet Beretta, and a partial license plate number.

Approximately fifteen minutes later, the police apprehended the appellant's cousin, Timmy Reese, nearby and brought him to the apartment for a show-up identification. Although initially Rankins was unsure whether Reese was the gunman, when Pease stated that Reese was the appellant's cousin, Rankins said, "No, that's not the guy." Approximately ten minutes later, the police apprehended the appellant in his blue Chevrolet Beretta a few blocks from Jenine McBride's apartment complex. The appellant was arrested and placed in the back of a police cruiser. When Rankins and Pease were brought to the scene of the arrest to identify the appellant, Rankins, without hesitation, identified the appellant as the gunman. At trial, Rankins again identified the appellant as the gunman, testifying that he was "positive" and "certain" that the appellant was the gunman. Rankins also testified that he had seen the appellant on two occasions prior to the shooting. Rankins recalled seeing the appellant in the Calsonic parking lot and also outside the Forest Hills Apartments prior to the shooting.

Trishia Pease testified on behalf of the State that she and the appellant had a relationship for approximately four and one-half years. During that time, the couple occasionally lived together and also conceived a child, Ashley Benson. The relationship ended in July 1997 and shortly thereafter, Pease began dating Andrew Rankins. On the night of August 16, 1997, Pease, Rankins, Ashley Benson, James McBride and Jenine McBride stayed at the McBride apartment. In the early morning hours, Pease was awakened by the sound of knocking or banging coming from the living room. As Rankins ran to the living room, Pease heard a gunshot and initially went into the hallway. As Rankins and the gunman wrestled, Pease crawled on the floor into the living room, grabbed the baby, and ran to a closet where she hid with the baby. Pease heard a second gunshot as she grabbed the baby from the living room floor.

When the police arrived, Pease could not identify the gunman but she did recall that he had a "small head" and was wearing black jogging pants, a dark top, and white tennis shoes. Pease did provide the police with information regarding the appellant's blue Chevrolet Beretta. However, because she was unsure of the gunman's identity, Pease did not identify either Reese or the appellant as the gunman.

On cross examination, Pease stated that Rankins and McBride had both been drinking that evening. Also, she claimed that when she gave the police information about the appellant's automobile, she was not suggesting that she thought the appellant was the gunman. Furthermore, in contrast to Rankins' testimony, Pease claimed that Rankins initially identified Reese as the gunman. However, Pease claimed that once she stated that the suspect's name was Timmy Reese, Rankins changed his mind and stated that Reese was not the gunman. Pease also recalled that at the time of the appellant's arrest, he was wearing a white shirt, blue shorts, and black tennis shoes.

James Donald McBride also testified that he spent the night of October 16, 1997 at his mother's apartment with Pease, Rankins, Benson and his mother. McBride was asleep on the living room floor when he was awakened by a banging noise and then gunfire coming through the front door. He testified that he saw three flashes of fire, the door "flew open" and he saw a person in the doorway. When the intruder entered the apartment, McBride "just took off" and ran out of the apartment. As he was running away from the apartment, he heard more gunfire. McBride then hid in the woods near the apartment until he saw someone he believed to be the intruder run out of the apartment in the direction of the woods. He returned to the apartment as the police were arriving. Although McBride could not identify the gunman, he testified at trial that the appellant's "stocky" build resembled the build of the gunman.

Jenine McBride recalled that in August 1997 she resided in the Forest Hills Apartment complex in Shelbyville. Late in the evening of August 16 or in the early morning hours of August 17, she was asleep on the living room sofa when her son and a number of his friends arrived at her apartment to spend the night. Sometime thereafter, Ms. McBride was awakened by a loud banging on the front door, and stood up but immediately observed fire coming through the door. Ms. McBride sat down again on the sofa when a gunman burst through the door, and "splattered" shots along the hallway and into the apartment. When Rankins and the gunman wrestled for control of the gun, the gunman fired another shot and Ms. McBride quietly left the apartment and proceeded to a neighbor's apartment where she called 911. Ms. McBride was unable to identify the gunman, but she remembered him as being "short and stocky."

Harold McKee, a sergeant with the Shelbyville Police Department, recalled that on August 17, 1997 at approximately 5:30 a.m. he and several

officers responded to a call at the Forest Hills Apartments. The dispatcher informed them that a break-in was in progress and shots had been fired. When the officers reached the apartment, they spoke with Rankins and determined that the gunman had fled the scene and had run into the nearby woods. McKee recovered the assault rifle used in the shooting and then he and the other officers searched the apartment. McKee and Ron Simmons, a police officer with the Shelbyville police department, also discovered spent shell casings, a bullet fragment, and live rounds in and around the apartment. Additionally, a search of the apartment revealed gunfire damage to the front door, the entry wall, living room wall, and bedroom wall.

Trey Clanton, another police officer with the Shelbyville Police Department, also responded to the call at Forest Hills Apartments. When he arrived at the apartment complex, Officer Clanton and another officer searched for the gunman in the woods near the apartment, but did not find a suspect. Shortly thereafter, another officer notified Clanton that the police had arrested a suspect, Timmy Reese, and were bringing him back to the apartment for a show-up identification. Clanton testified that Rankins was at the apartment when they arrived and Clanton asked if Rankins could identify Reese. Rankins observed Reese and said, "I'm not sure if this is him," and then said, "No, its not him." The police officers asked Rankins again if Reese was the gunman and again Rankins responded negatively. According to Clanton, Rankins also indicated that there was more than one intruder at the apartment but Rankins could not identify the second person.

Following the unsuccessful show-up identification, Clanton decided to search the area around the apartment for the appellant's blue Chevrolet Beretta. Shortly thereafter, Clanton observed the appellant's automobile on Depot Street and stopped the appellant. Clanton contacted the police officers who had remained at the apartment and directed them to bring Rankins and Pease to the scene of the appellant's arrest for a show-up identification. Clanton testified that, upon viewing the appellant, Rankins said without hesitation, "This is the man that was inside the house."

The appellant testified that in August 1997 he lived and worked in Fayetteville, Tennessee. He and Trishia Pease had been involved in a relationship which produced a child, Ashley Benson. That relationship ended in July 1997. The appellant testified that on August 16, 1997, he worked until 11:00 p.m. After work, he drove his blue Chevrolet Beretta to Shelbyville to see his sister, Phyllis Benson. He arrived in Shelbyville at approximately 12:00

a.m. At that time, he was wearing a white t-shirt, blue shorts, and black tennis shoes.

Upon his arrival in Shelbyville, the appellant drove to Ms. Benson's apartment, but discovered that she was not home. He then drove to the home of Ms. Benson's mother who informed the appellant that his sister had gone to a local nightclub. The appellant eventually found Ms. Benson at the nightclub, where they remained until approximately 2:30 or 3:00 a.m. The appellant and Ms. Benson then left the nightclub and proceeded back to Ms. Benson's apartment. Although Ms. Benson made a "pallet" on the couch for him, the appellant testified that he stayed awake and watched television. At approximately 6:15 or 6:30 a.m., the appellant awakened Ms. Benson, said good-bye, and left the apartment in his automobile. As the appellant was attempting to leave Shelbyville and return to Fayetteville, he became lost and was pulled over by a police officer who informed him that he was under arrest for the shooting that occurred at the McBride apartment. The appellant denied any involvement in the shooting at the McBride apartment and requested a gunshot residue test. However, the police did not perform a gunshot residue test on the appellant. The appellant also stated that he was not jealous of Pease's relationship with Rankins.

On cross examination, the appellant stated that he did not remember seeing Rankins at any time prior to the identification following the shooting. The appellant admitted that he had been to Forest Hills Apartments prior to the shooting to give a fellow employee a ride to work. On that day, he remembered seeing Pease but did not recall seeing Rankins. The appellant also did not recall how many years he had lived with Pease before their separation nor how much time had elapsed between their separation and the shooting. The appellant also indicated that he had little contact with Timmy Reese prior to the shooting.

Phyllis Benson, the appellant's sister, testified on behalf of the appellant that she saw the appellant at a nightclub on the weekend of August 17, 1997. On August 16, 1997, the appellant arrived at the nightclub sometime after 10:00 p.m. While at the nightclub, she and the appellant consumed alcohol. Ms. Benson testified that she and the appellant left the nightclub at approximately 2:30 a.m. and arrived back at her apartment at approximately 2:45 a.m. They watched television until she went to sleep sometime between 3:30 a.m. and 4:00 a.m. Ms. Benson recalled that the appellant woke her sometime between 6:00 a.m. and 6:30 a.m. and left her apartment.

>On cross examination, Ms. Benson stated that she met Timmy Reese the weekend prior to the shooting. In contrast to the appellant's testimony, Ms. Benson recalled that Reese and the appellant were together the weekend prior to the shooting. However, she did not see Reese with the appellant on the weekend of the shooting. Ms. Benson also stated that she had been awake since approximately 6:00 a.m. on the day before the shooting, and she also admitted that she began drinking alcohol at about 6:00 p.m. on the evening of the shooting.

*State v. Benson*, 2000 WL 19535 at **1-5 (footnote omitted).

In considering Benson's claim that the evidence was not sufficient to support the conviction, the Tennessee Court of Criminal Appeals noted the standard is that set forth in *Jackson v. Virginia*. *State v. Benson*, 2000 WL 19535 at *5. The appellate court also observed that "it is well-established that the identification of a defendant as the person who committed the offense for which he is on trial is a factual issue to be determined by the jury upon consideration of all competent proof." *Id*. at *6 (citations omitted). The court then concluded that the evidence was sufficient to support Benson's conviction:

>In this case, testimony at trial indicated that Rankins struggled with the gunman for several minutes. During the struggle, the stocking covering the gunman's head rolled up. Rankins was on top of the gunman at this point and had the opportunity to view the gunman's eyes and face for several moments. Although the room was darkened, Rankins had seen the appellant on two prior occasions. While Rankins expressed some uncertainty when asked to identify Reese, he expressed no such uncertainty when he identified the appellant several hours after the shooting. Additionally, at trial, Rankins was certain of his identification. Moreover, James McBride testified that the appellant's physical characteristics matched the gunman's physical characteristics. Finally, the police arrested the appellant a short time and distance from the scene of the shooting.
>
>Although the appellant presented an alibi defense, the jury, by returning a guilty verdict, accredited the testimony of the State's witnesses. In light of the

trial court's complete instructions concerning identification testimony, it was the prerogative of the jury to accredit Rankins' identification. Accordingly, we conclude that the evidence is sufficient for a rational trier of fact to find the appellant guilty beyond a reasonable doubt. This issue is without merit.

*Id*.

As noted earlier by this court, Benson has failed to rebut, by clear and convincing evidence, the factual findings of the Tennessee Court of Criminal Appeals and they are presumed correct by this court.

This court has reviewed the transcript of Benson's trial [Addendum 1, Transcript of the Evidence, volumes I-III] and finds the decision by the Tennessee Court of Criminal Appeals is supported in the record. This court thus concludes that the appellate court's determination that the evidence was sufficient to support the convictions for two counts of attempted first degree murder and three counts of reckless endangerment was neither contrary to, nor did it involve an unreasonable application of, federal law as established by the U.S. Supreme Court in *Jackson v. Virginia*. Accordingly, Benson is not entitled to habeas relief on this issue.

IV.  Conclusion

The petition for habeas corpus relief will be **DENIED** and this action **DISMISSED**. Rule 4 of the Rules Governing Section 2254 Cases In The United States District Courts. Benson having failed to make a substantial showing of the denial of a constitutional right,

a certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253(c); Rule 22(b) of the Federal Rules of Appellate Procedure. The court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. *See* Rule 24 of the Federal Rules of Appellate Procedure. The court will further **DENY** Benson leave to proceed *in forma pauperis* on appeal.

**AN APPROPRIATE ORDER WILL ENTER.**

                                             */s/Harry S. Mattice, Jr.*
                                             HARRY S. MATTICE, JR.
                                             UNITED STATES DISTRICT JUDGE